UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HERMAN BELL,

                                            Plaintiff,                      9:20-cv-256 (BKS/TWD)

v.

New York State Corrections Officers JEREMY SAUNDERS, CHRISTOPHER WINCHELL, ANTHONY WETHERBY, PATRICK BROCKWAY, and JUSTIN QUAIN, in their individual capacities,
                                           Defendants.
_____

**Appearances:**

*For Plaintiff:*
David B. Rankin
Regina Powers
Beldock Levine & Hoffman, LLP
99 Park Avenue, PH/26th Floor
New York, NY 10016

*For Defendant Jeremy Saunders:*
Ryan T. Donovan
Lukas M. Horowitz
Conway, Donovan & Manley, PLLC
50 State Street, 2nd Floor
Albany, NY 12207

*For Defendant Christopher Winchell:*
Lawrence Elmen
Elmen Law Firm P.C.
24 Pine Street, Suite 4
Glens Falls, NY 12801

*For Defendant Anthony Wetherby:*
Gregory J. Teresi
Teresi Law, PLLC
72 County Route 59
Lake George, NY 12845

*For Defendant Patrick Brockway:*
James C. Knox
Alishah E. Bhimani
E. Stewart Jones Hacker Murphy, LLP
28 Second Street
Troy, NY 12180

*For Defendant Justin Quain*:
Anna V. Seitelman
Donald T. Kinsella
Christina F. Vitolo
Whiteman Osterman & Hanna LLP
One Commerce Plaza
Albany, NY 12260

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

Plaintiff Herman Bell, a former New York state inmate, brings this civil rights action under 42 U.S.C. § 1983, claiming Defendants Jeremy Saunders, Christopher Winchell, Anthony Wetherby, Patrick Brockway, and Justin Quain violated his rights secured by the Eighth and Fourteenth Amendments while Plaintiff was incarcerated at Great Meadow Correctional Facility ("Great Meadow").[1] (Dkt. No. 56). Plaintiff alleges that: (1) Defendants violated his right to be free of cruel and unusual punishment by subjecting him to excessive force or failing to intervene to prevent that use of force; and (2) Defendants violated his right to procedural due process by fabricating evidence against him, leading to his confinement in the Special Housing Unit ("SHU") for approximately thirty days. (*Id.*). Presently before this Court are various motions for summary judgment. (*See* Dkt. Nos. 145, 146, 150, 154). Defendants Quain, Brockway, and

---

[1] As stated in this Court's decision on Defendant Winchell's motion to dismiss, Plaintiff's amended complaint refers to his incarceration at "Great Meadows Correctional Facility," but the correct name of the facility appears to be "Great Meadow Correctional Facility." *Bell v. Saunders*, No. 20-cv-256, 2022 WL 2064872 at *1 n.1, 2022 U.S. Dist. LEXIS 101994, at *1 n.1 (N.D.N.Y. June 8, 2022).

2

Wetherby move for summary judgment on both of Plaintiff's claims, (Dkt. No. 146, 150, 154), and Defendant Saunders moves for summary judgment on Plaintiff's procedural due process claim only, (Dkt. No. 145). Plaintiff opposes the motions so far as they seek summary judgment on Plaintiff's claim for use of excessive force and failure to intervene. (Dkt. No. 158). Defendants Quain and Brockway filed replies. (Dkt. Nos. 162, 164). For the reasons that follow, Defendants Quain, Brockway, and Wetherby's motions are granted in part and denied in part and Defendant Saunders' motion is granted.

## II.   FACTS[2]

On September 5, 2017, Plaintiff was incarcerated at Great Meadow, and Defendants Saunders, Winchell, Quain, Wetherby, and Brockway were corrections officers working there. At approximately 10:00 am, Plaintiff was in the "Yard" on a phone call with his wife when two fights between inmates broke out. (Dkt. No. 150-15, ¶¶ 7, 20; Dkt. No. 154-13, ¶¶ 11, 26; *see* Dkt. No. 160, at 9 ¶ 7, 11 ¶ 20, 23 ¶ 11, 25 ¶ 26). Over a public address system, a sergeant announced the closure of the Yard and ordered the inmates to hang up the phones. (Dkt. No. 150-15, ¶ 21; Dkt. No. 154-13, ¶ 27; *see* Dkt. No. 160, at 11 ¶ 21, 25 ¶ 27). After the announcement, Defendant Saunders approached Plaintiff who was then hanging up the phone. (Dkt. No. 150-15, ¶¶ 25–27; Dkt. No. 154-13, ¶¶ 31–33; *see* Dkt. No. 160, at 11 ¶¶ 25–27, 25–26 ¶¶ 31–33). Defendant Saunders ordered Plaintiff to put his hands behind his back and escorted Plaintiff from the Yard in the direction of the mess hall entrance without handcuffs. (Dkt. No. 150-15, ¶¶ 28, 37; Dkt. No. 154-13, ¶¶ 34, 43; *see* Dkt. No. 160, at 11–12 ¶¶ 28, 37, 26–27 ¶¶ 34, 43). Defendant Saunders held Plaintiff's hands together in one of his own hands during the escort.

---

[2] The facts are drawn from the moving Defendants' statements of material facts, (Dkt Nos. 145-5, 146-12, 150-15, 154-13), and Plaintiff's responses, (Dkt. No. 160), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

3

(Dkt. No. 150-15, ¶ 42; Dkt. No. 154-13, ¶ 47; *see* Dkt. No. 160, at 13 ¶ 42, 27 ¶ 47). Defendant Winchell observed the escort and provided backup to Defendant Saunders. (Dkt. No. 150-15, ¶ 40; Dkt. No. 154-13, ¶ 46; *see* Dkt. No. 160, at 13 ¶ 40, 27 ¶ 46). All three entered the mess hall foyer. (Dkt. No. 150-15, ¶ 43; Dkt. No. 154-13, ¶ 49; *see* Dkt. No. 160, at 13 ¶ 43, 27 ¶ 49).

While in the mess hall foyer, Defendant Saunders released Plaintiff's hands. (Dkt. No. 150-15, ¶ 44; Dkt. No. 154-13, ¶ 50; *see* Dkt. No. 160, at 13 ¶ 44, 27 ¶ 50). An altercation subsequently occurred between Defendant Saunders and Plaintiff. (Dkt. No. 150-15, ¶ 45; Dkt. No. 154-13, ¶ 51; *see* Dkt. No. 160, at 13 ¶ 45, 27 ¶ 51). The parties' descriptions of the events differ. Plaintiff testified that Defendant Saunders struck the side of Plaintiff's face with his hand and pushed Plaintiff, who fell on the floor, and began punching Plaintiff in the face. (Dkt. No. 150-8, at 192–95[3]). Plaintiff stated that he "heard the presence of other COs in the area" and that he "was being punched and kicked." (*Id.* at 196). He testified:

> At that point, it seems to me that the blows didn't cease, and there was—someone was on their knees, and they kneed me in my ribs several times, and someone grabbed my head, their fingers, like, right at my head, two hands, and slammed it into the floor several times. It was as if they were trying to split a melon. I heard someone else say try this, and I saw this canister come across, but actually I didn't know what it was, and it was sprayed into my eyes directly, very close, said try this and sprayed it in my mouth, and I'm desperate for air now. I'm gasping. Someone was tugging at my feet, and he was twisting my leg. I assumed he was trying to break it or whatever, and so—and I know even more COs showed up in the area. I don't see them but I can hear, like, more. I can hear their keys bouncing. I know that there are more, and I think that the spray—the pepper spray was so thick in the area that no—whoever else had showed up in the area, they were not really interested in me anymore because the pepper spray was so thick, and someone raised me. I'm leaning against the wall trying to take in some air. Someone asked me my name and what—my DIN number, and I think I responded to that. At some point, somebody put handcuffs on me. A camera appeared somewhere.

---

[3] Internal page numbers are provided for Dkt. No. 150-8.

(*Id.* at 196–97). Plaintiff estimated that the altercation lasted "5, 6, 10 minutes." (*Id.* at 202).

According to Defendants Saunders and Winchell, after Defendant Saunders released Plaintiff's hands, Plaintiff spun and punched or struck Defendant Saunders on his forehead. (*See* Dkt. No. 150-3, at 76–77; Dkt. No. 150-4, at 71). Both Defendants Saunders and Winchell stated that Winchell tackled or forced Plaintiff to the ground, (Dkt. No. 150-3, at 89–90; Dkt. No. 150-4, at 77), and they described Plaintiff's resistance to attempts to gain control of his arms, (Dkt. No. 150-3, at 104–08; Dkt. No. 150-4, at 96–97, 101).[4]

According to Defendant Wetherby, he entered the mess hall foyer and observed two corrections officers "struggling with the inmate." (Dkt. No. 155-5, at 12–13). Defendant Wetherby stated that he ran "toward the struggle in the hallway," "approached [Plaintiff] on his left side," "knelt down to his left arm," and "tried to get [Plaintiff's] left arm from out from under his stomach." (*Id.* at 13). At some point after Defendant Wetherby arrived at the mess hall foyer Defendant Saunders called for assistance using his personal two-way radio. (Dkt. No. 150-15, ¶ 61; Dkt. No. 154-13, ¶ 68; *see* Dkt. No. 160, at 15 ¶ 61, 30 ¶ 68). Defendants Brockway and Quain heard a "Level Two" call, which can indicate an altercation between an inmate and a staff member, and went to the mess hall foyer to respond. (*See* Dkt. No. 146-12, ¶¶ 14–16, 18; Dkt. No. 150-15, ¶¶ 62–63, 66; *see* Dkt. No. 160, at 6 ¶¶ 14–16, 18, 15–16 ¶¶ 62–63, 66). According to Defendant Brockway, when he arrived at the scene three other officers were

---

[4] Plaintiff in his response to the Defendants' statements of material facts disputes Defendants' various characterizations that he was non-compliant during this time, instead asserting that he "was attempting to shield himself from an ongoing assault." (Dkt. No. 160, at 7 ¶ 26; *see also id.* at 14 ¶ 55 ("Mr. Bell was attempting to decrease the damage the defendants were doing, characterizing this as resisting is disingenuous."), 28 ¶ 61 (same)).

struggling to restrain Plaintiff and Defendant Brockway responded by applying downward pressure on Plaintiff's legs in an effort to restrain them. (Dkt. No. 150-6, at 27, 31–32).

According to Defendant Quain, when he arrived at the mess hall foyer he saw four officers attempting gain Plaintiff's compliance. (Dkt. No. 146-3, at 31). Defendant Winchell asked if any of the officers were carrying O.C. spray, which is a tool used to gain compliance over inmates. (Dkt. No. 150-15, ¶¶ 78–79; Dkt. No. 154-13, ¶¶ 85–86; *see* Dkt. No. 160, at 18 ¶¶ 78–79, 32–33 ¶¶ 85–86). Defendant Quain handed Defendant Winchell his OC spray. (Dkt. No. 146-12, ¶ 27; Dkt. No. 150-15, ¶ 80; Dkt. No. 154-13, ¶ 87; *see* Dkt. No. 160, at 7–8 ¶ 27, 18 ¶ 80, 33 ¶ 87). Defendant Winchell used the O.C. spray on Plaintiff. (*See* Dkt. No. 146-12, ¶ 31; Dkt. No. 160, at 8 ¶ 31). After the O.C. spray was deployed, Plaintiff gave up his arms, was placed in handcuffs, and brought to the infirmary. (*See* Dkt. No. 146-12, ¶ 32; Dkt. No. 150-15, ¶ 86; Dkt. No 154-13, ¶ 92; Dkt. No. 160, at 8 ¶ 32, 19 ¶ 86, 33 ¶ 92).

While in the infirmary, Plaintiff told medical personnel that he was experiencing pain in his face and in his right side near his kidneys. (Dkt. No. 150-15, ¶ 87; *see* Dkt. No. 160, at 19 ¶ 87). Plaintiff's face, chest, and back were x-rayed. (Dkt. No. 150-15, ¶ 89; Dkt. No. 154-13, ¶ 95; *see* Dkt. No. 160, at 20 ¶ 89, 34 ¶ 95). Plaintiff was treated for his complaint of injuries to his face and pain by his right ribs. (Dkt. No. 150-15, ¶ 93; Dkt. No. 154-13, ¶ 99; *see* Dkt. No. 160, at 20 ¶ 93, 34 ¶ 99). A DOCCS Health Service Systems medical record indicated that Plaintiff had suffered a "concussion and intracranial injury" in addition to fractured ribs after the altercation. (Dkt. No. 150-15, ¶ 94; Dkt. No. 154-13, ¶ 100; *see* Dkt. No. 160, at 20 ¶ 94, 34 ¶ 100). Plaintiff's medical records indicate that he did not complain of nor was treated for knee

6

pain or injury to his left side. (Dkt. No. 154-13, ¶¶ 98–99; *see* Dkt. No. 150-15, ¶¶ 92–93; Dkt. No. 160, at 20 ¶¶ 92–93, 34 ¶¶ 98–99).[5]

On the day of the altercation, Defendant Saunders signed a misbehavior report which described Plaintiff as having "refused [his] orders" to hang up the phone in the "Big Yard" and as having "abruptly spun to his left and struck [him] in the upper forehead with a closed right first" after entering the mess hall foyer. (Dkt. No. 150-14, at 1; *see also* Dkt. No. 150-3, at 138–39). Plaintiff was placed in SHU for approximately thirty days. (Dkt. No. 145-5, ¶¶ 3–4; *see* Dkt. No. 160, at 3 ¶¶ 3–4). While in SHU, Plaintiff received eye drops and a brace for his cracked ribs. (Dkt. No. 145-5, ¶¶ 7–8; *see* Dkt. No. 160, at 3 ¶¶ 7–8). Two investigators from the Office of Special Investigations interviewed Plaintiff on September 26, 2017, regarding the incident. (*See* Dkt. No. 150-9).

The "Arbitrator's Opinion and Award" in Defendant Winchell's subsequent arbitration found that "the entire canister [of O.C. spray] was used on inmate Bell," consisting of 1.5 ounces, based on the logged weights of the canister before and after the altercation. (Dkt. No. 159-4, at 3). This amount is the equivalent of 5.5 applications. (*Id.*). DOCCS "only allows a maximum of 5 applications to be used in one incident, on one individual." (*Id.*). The opinion also stated that "the conditions leading up to the use of OC spray on Bell did not warrant the use of OC spray to begin with," because prior to the use of the spray "Bell was restrained and not posing a threat. If an inmate is not posing a danger or a threat to officers and OC spray is used, then the use of OC spray is unjustified." (*Id.* at 4).

---

[5] Plaintiff later received a total knee replacement in 2020 as a result of an osteoarthritic condition, but Plaintiff's expert did not find the altercation to be a proximate cause of Plaintiff's need for surgery and found no evidence that Plaintiff's knee was directly harmed during the altercation. (Dkt. No. 150-15, ¶¶ 97–99; Dkt. No. 154-13, ¶¶ 103–105; *see* Dkt. No. 160, at 20–21 ¶¶ 97–99, 35 ¶¶ 103–105).

### III.    STANDARD OF REVIEW

Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may meet this burden by showing that the nonmoving party has "'fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party has "failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))). If the moving party meets this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In ruling on a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Wilson v. NW Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citing *Anderson*, 477 U.S. at 255). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV. DISCUSSION

### A. Eighth Amendment

Defendants Quain, Wetherby, and Brockway argue that Plaintiff's Eighth Amendment claim should be dismissed and summary judgment entered in their favor on this issue. (Dkt. No. 146-1, at 10–15; Dkt. No. 150-2, at 7–12; Dkt. No. 154-2, at 4–9). Plaintiff asserts that there are genuine issues of material fact such that these claims cannot be resolved on summary judgment. (Dkt. No. 158, at 7–11).

A prisoner raising an excessive force claim under § 1983 must show that there has been a violation of the Eighth Amendment's prohibition against the use of cruel and unusual punishment. *See Wright*, 554 F.3d at 268. "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 7–8 (1992)). "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions

characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct," which, in this context, depends on "whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (internal quotation marks and citations omitted). Several factors are relevant to the analysis of the subjective element, including: "the extent of the injury and the mental state of the defendant, as well as 'the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.'" *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (quoting *Romano v Howarth*, 998 F.2d 101, 105 (2d Cir. 1993)).

The objective component "focuses on the harm done, in light of 'contemporary standards of decency,'" and "[i]n assessing this component, the court must asks whether 'the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation.'" *Wright*, 554 F.3d at 268 (citations omitted). However, "when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. . . . This is true whether or not significant injury is evident.'" *Id.* at 268–69 (citing *Hudson*, 503 U.S. at 9).

Furthermore, "[p]rison officials can be held liable under 42 U.S.C. § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence." *Randolph v. Griffin*, 816 F. App'x 520, 523 (2d Cir. 2020) (citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)). A corrections officer may be liable under a failure-to-intervene theory if: "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the

officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1998)), *aff'd sub nom. Jean-Laurent v. Wilkerson*, 461 Fed. App'x 18 (2d Cir. 2012).

Finally, personal involvement is an essential element of any claim brought under § 1983. *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted); *see also Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Thus, "a plaintiff must . . . prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti*, 983 F.3d at 618 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

### 1. Defendant Quain

Defendant Quain argues that he had no personal involvement in the alleged incident and therefore cannot be liable under Section 1983. (Dkt. No. 146-1, at 10–15; *see also* Dkt. No. 162, at 5–6). He contends that "no reasonable trier of fact could conclude that [he] possessed any knowledge of any excessive force allegedly used by other Defendants and had a realistic opportunity to intervene and prevent the harm from occurring." (Dkt. No. 146-1, at 12 (citing *Curley*, 268 F.3d at 72)); *see also* Dkt. No. 162, at 5–6).

"A plaintiff may establish an officer's personal involvement through facts suggesting that the officer was either personally involved in the use of force or was present during the use of force and failed to intervene." *Piper v. City of Elmira*, 12 F. Supp. 3d 577, 596 (W.D.N.Y. 2014) (Payson, M.J.) (citation omitted); *see Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003) (citations omitted), *aff'd sub nom. Jeffreys v. City of N.Y.*, 426 F.3d 549 (2d Cir. 2005). "In adducing such facts, the 'plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene.'" *Piper*, 12 F. Supp. 3d at 596 (citing *Jeffreys*, 275 F. Supp. 2d at 474).

Here, the facts indicate that Defendant Quain was present for part of the altercation during which Plaintiff claims his rights were violated. Defendant Quain testified that he arrived at the scene of the incident, (Dkt. No. 146-3, at 31), handed Defendant Winchell his O.C spray, (*id*. at 40–41), and remained until a sergeant relieved him, (*id.* at 55–56). At the same time, Plaintiff testified that at least some of the assault continued after the O.C. was sprayed. . (*See* Dkt. No. 150-8, at 197) (describing how after O.C. was sprayed "someone was tugging at my feet, and he was twisting my leg. I assumed he was trying to break it . . . ."). Accordingly, there is a genuine dispute of material fact regarding what occurred at the scene and Defendant Quain's role in the incident.

Defendant Quain argues that "there is no genuine dispute of material fact that Defendant Quain did not possess any actual knowledge of the use by another corrections officer of excessive force because when he arrived at the scene, the officers were trying to restrain a non-compliant incarcerated individual and he had not observed any excessive force or was aware of how the incident started." (Dkt. No. 146-1, at 15). But, as stated, there exists evidence suggesting excessive force *was* used during the time Defendant Quain was present and involving events of which Defendant Quain undeniably had knowledge, including through the use of the O.C. spray itself. (*See* Dkt. No. 159-4, at 3–4). This is enough for such a claim to survive summary judgment. *See, e.g.*, *De Michele v. City of N.Y.*, No. 9-cv-9334, 2012 WL 4354763, at *17, 2012 U.S. Dist. LEXIS 136460, at *53 (S.D.N.Y. Sept. 24, 2012) ("Given that [Defendants] were concededly all present when the alleged, repeated acts of abuse took place, they had an opportunity to intervene.").

Additionally, while, as Defendant Quain states, it is true that merely being in the vicinity of an incident is not enough to preclude summary judgment in a defendant's favor, it is

inaccurate to say that "Plaintiff has failed to raise a triable issue of fact with respect to whether Defendant Quain had a reasonable opportunity to intervene." (Dkt. No. 162, at 6; *see also* Dkt. No. 146-1, at 15). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citing *O'Neill*, 839 F.2d at 11). Plaintiff estimated that the attack took around five to ten minutes, (Dkt. No. 150-8, at 202), and Defendant Quain himself stated that it was "a couple minutes" between the time he arrived on the scene and the time that Plaintiff was restrained, (Dkt. No. 146-3, at 57).[6] Additionally, Plaintiff testified that he was repeatedly assaulted, (*see* Dkt. No. 150-8, at 196–98), and "[w]hen a victim is subject to multiple incidents of abuse . . . the likelihood that an officer would be able to intervene is greater," *Gonzales v. Waterbury Police Dep't*, 199 F. Supp. 3d 616, 623 (D. Conn. 2016) (citing *O'Neill*, 839 F.2d at 11). There are issues of fact as to whether there was sufficient opportunity for Defendant Quain to intervene and thus Plaintiff's Eighth Amendment claim against him cannot be dismissed on this basis either.

### 2. Defendants Wetherby and Brockway

Defendants Wetherby and Brockway both dispute the existence of material facts indicating that excessive force was used on Plaintiff. (Dkt. No. 150-2, at 9–11; Dkt. No. 154-2, at 6–8). Plaintiff responds that "[t]he severity of the assault, coupled with the total lack of need for such force, is more than enough for a reasonable juror to find that the officers acted wantonly and in bad faith and violated contemporary standards of decency." (Dkt. No. 158, at 8).

---

[6] Defendant Quain also stated that he did not know exactly how much time passed between the time he arrived at the scene and when he handed over the O.C. spray, but that it was "probably fairly quickly." (Dkt. No. 146-3, at 57).

13

Here, there are genuine disputes of fact relevant to whether the subjective and the objective elements are met. With respect to the subjective element, Defendants Wetherby and Brockway contend that the force used was only meant to counter Plaintiff's attempts to resist being restrained and "was not used maliciously or sadistically for the purpose of causing harm." (Dkt. No. 150-2, at 10; Dkt. No. 154-2, at 7). But a jury could credit Plaintiff's testimony that his resistance was to shield himself from attacks, (*see* Dkt. No. 150–8, at 299; *see also id.* at 268–69), and therefore that the force used against him was entirely unnecessary.

Moreover, there are facts in the record from which a jury could infer that Defendant Brockway, who stated he applied downward pressure to Plaintiff's leg, (*see* Dkt. No. 150-6, at 31–32), sadistically used force on Plaintiff's leg and foot at the time where Plaintiff was already incapacitated by O.C. spray, (*see* Dkt. No. 150-8, at 197 (testifying that after he was O.C. sprayed, "[s]omeone was tugging at my feet, and he was twisting my leg. I assumed he was trying to break it or whatever."); *id.* at 271 ("[At] first it seemed like this person tried to remove my shoe. . . . Initially I thought perhaps taking off my shoe, break my ankle, whatever the case may be. That person became frustrated, couldn't get my shoe off. That's when the person started twisting my leg.")).

Defendants Wetherby and Brockway also argue that the objective element cannot be satisfied because: first, with respect to Defendant Wetherby, the only contact he had with Plaintiff was with his left arm and no injuries to his left arm or side were alleged,[7] (Dkt. No. 154-2, at 8); and second, with respect to Defendant Brockway, the only contact he had with Plaintiff was with Plaintiff's legs, and the only leg injury Plaintiff asserts is a knee injury that Plaintiff's

---

[7] While Plaintiff did not dispute in his statement of facts that "[a]ccording to [his] medical records detailing his condition immediately after the incident, [he] did not complain of nor was he treated for knee pain or injury to his left side," (Dkt. No. 160, ¶ 98), his testimony did indicate that that he received injuries on this side, (*see* Dkt. No. 150-8, at 193, 267–68).

14

expert identified as arising from another competent producing cause and the expert did not identify any evidence that the injury arose from the incident in question, (Dkt. No. 150-2, at 10–11).

To survive summary judgment, a Plaintiff need not put forward evidence of serious injury in an excessive force claim if "a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically." *See Wright*, 554 F.3d at 269 (citations omitted). As described, a jury could find that malicious and sadistic force was used here. More importantly, however, Defendants Wetherby and Brockway and Plaintiff all agree that there is evidence indicating Plaintiff sustained multiple injuries including broken ribs and a concussion. (Dkt. No. 150-15, ¶ 94; Dkt. No. 154-13, ¶ 100; *see* Dkt. No. 160, at 20 ¶ 94, 34 ¶ 100). Such injuries are clearly more than de minimis. *See Green v. Lewalski*, No. 18-cv-774, 2021 WL 5585919, at *5, 2021 U.S. Dist. LEXIS 229366, at *13 (W.D.N.Y. Nov. 30, 2021) (finding "lacerations, bruises, and [a] broken rib are not *de minimis* for the purpose of [the plaintiff's] Eighth Amendment claims of excessive force at [the summary judgment] stage."). While Defendants Wetherby and Brockway have pointed to evidence that could indicate they did not cause these specific injuries, a jury is free to credit Plaintiff's version of events and find that Wetherby and Brockway were indeed responsible. *Gonzales*, 199 F. Supp. 3d at 621–22 (explaining that at trial, a jury may rely on circumstantial evidence to find a particular officer liable for a particular injury, even if a plaintiff cannot "positively identify . . . which defendant took what particular action."). Consequently, there are several genuine issues of material fact relevant to whether the objective element may be satisfied.

Further, both Defendants' Brockway and Wetherby's arguments regarding the failure to intervene fail for the same reasons that Defendant Quain's arguments do. Both Defendants were, for a portion of time,[8] present at the scene and it therefore is up to the jury to determine whether, if excessive force was used, they had a "realistic opportunity" to prevent it. *See Anderson*, 17 F.3d at 557.

### 3. Qualified Immunity

Defendants Quain, Wetherby, and Brockway contend that they are shielded from liability under the doctrine of qualified immunity. (Dkt. No. 146-1, at 18–21; Dkt. No. 150-2, at 13–15; Dkt. No. 154-2, at 11–13). Plaintiff argues that qualified immunity is unavailable to these Defendants "because under the established law, the conduct is clearly unreasonable if a constitutional violation is found" and if the Court disagrees, "there are at the very least factual disputes which would preclude the finding of qualified immunity." (Dkt. No. 158, at 13 (citing *Franco v. Gunsalus*, 972 F.3d 170, 174 (2d Cir. 2020)).

On summary judgment, claims of qualified immunity are evaluated "using a two-part inquiry: (1) 'whether the facts, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a federal right' and (2) 'whether the right in question was clearly established at the time of the violation.'" *Sloley v. VanBramer*, 945 F.3d 30, 36 (2d Cir. 2019) (quoting *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014)). The Court may address either prong first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). It is the defendants' burden to establish entitlement to qualified immunity. *Vincent v. Yelich*, 718 F.3d 157, 166 (2d

---

[8] As part of his argument as to why he did not have the opportunity to intervene, Defendant Brockway argues that "Brockway's contact with Plaintiff lasted mere seconds," (Dkt. No. 150-2, at 12), but the degree of time that Defendant Brockway was at the scene is disputed, (*see* Dkt. No. 160, at 19 ¶ 83).

Cir. 2013). To demonstrate entitlement to summary judgment based on qualified immunity, a defendant must:

> [A]dduce sufficient facts such that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (brackets and internal citation marks omitted) (citing *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1997)). "Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) (citation omitted).

Defendants have not met their burden to establish qualified immunity. First, "a prisoner's right to be free from . . . excessive force by prison officials is clearly an established constitutional right." *Jean-Laurent*, 540 F. Supp. 2d at 513 (citations omitted). Second, there exist genuine disputes of fact underlying the excessive force and failure to intervene claims that are relevant to assessing the reasonableness of Defendants' conduct, including the extent of Defendants' participation in the alleged use of force, what Defendants observed, and the force that was used. Accordingly, Defendants Quain, Wetherby, and Brockway are not entitled to qualified immunity at this time. *See, e.g.*, *Jeanty v. Cnty of Orange*, 379 F. Supp. 2d 533, 542 (S.D.N.Y. 2005) (denying summary judgment on the basis of qualified immunity because "the same genuine issues of material fact that preclude summary judgment on plaintiff's excessive force claim, also preclude application of the defense of qualified immunity at the summary judgment stage"); *Allen v. City of N.Y.*, 480 F. Supp. 2d 689, 696 (S.D.N.Y. 2007) (denying summary judgment on the basis of qualified immunity because "a reasonable juror could find that [two corrections

officers'] failure to intervene while [a third corrections officer] assaulted [the plaintiff] permitted [the third corrections officer] to violate [the plaintiff's] clearly established rights of which a reasonable officer would have been aware and that this failure to intervene was objectively unreasonable").

### B. Procedural Due Process

Defendants Saunders, Quain, Wetherby, and Brockway all seek the dismissal of Plaintiff's claim alleging that Plaintiff's procedural due process rights were violated. (Dkt. No. 145-6, at 4–8; Dkt. No. 146-1, at 16–18; Dkt. No. 150-2, at 13; Dkt. No. 154-2, at 10–11). Plaintiff does not oppose dismissal of this claim. (Dkt. No. 158, at 5).

The Court previously dismissed Plaintiff's procedural due process claim as against Defendant Winchell in response to Defendant Winchell's motion to dismiss. *Bell*, 2022 WL 2064872 at *6–7, 2022 U.S. Dist. LEXIS 101994, at *13–18. For the same reasons as articulated in that decision, *see id.*, the Court grants the current motions with respect to this claim, and dismisses the procedural due process claim as against all Defendants.

### V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant Saunders' motion for summary judgment, (Dkt. No. 145), is **GRANTED**; and it is further

**ORDERED** that Defendants Quain, Brockway, and Wetherby's motions for summary judgment, (Dkt. Nos. 146, 150, 154), are **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Plaintiff's second cause of action alleging the violation of Plaintiff's procedural due process rights is **DISMISSED**; and it is further

**ORDERED** that Plaintiff's first cause of action alleging the violation of Plaintiff's Eighth Amendment rights will proceed to trial against all remaining Defendants.

**IT IS SO ORDERED.**

Dated: December 11, 2024
Syracuse, New York

*/s/ Brenda K. Sannes*
Brenda K. Sannes
Chief U.S. District Judge